IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Case No. 5:23-CR-00336-M-BM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CELESTIO LEFRANZ HARRINGTON,<br><br>    Defendant. | ORDER |

This matter comes before the court on Defendant's Motion to Suppress. [DE 29]. Defendant seeks to exclude all evidence obtained during a traffic stop conducted by law enforcement on March 29, 2023. *Id.* at 1. The court held a hearing and heard oral argument from the parties on January 13, 2025. For the following reasons, the motion is denied.

I. **Factual Findings**

The courts makes the following findings of fact. Unless otherwise stated, they derive from the testimony heard at the January 13, 2025, hearing and the parties' briefs.

On January 19, 2023, law enforcement interviewed a confidential informant who identified "Pete" as a supplier in a drug trafficking scheme. The informant did not know his given name, but he provided law enforcement Pete's phone number. He described Pete as a black male in his late thirties and stated that he drove a white Lincoln SUV and associated with a drug supplier named Brian or Brandon from Charlotte, North Carolina. The informant admitted to purchasing between eight and nine ounces of methamphetamine from Pete every other week for some unknown period of time.

The phone number provided by the informant was registered to Defendant. Toll records obtained by law enforcement confirmed twenty-eight phone calls between Defendant's phone and the informant's. Further review revealed that Defendant's phone had previously communicated with phone numbers belonging to individuals known by law enforcement to be under investigation or indictment for drug-trafficking.

In early February, law enforcement obtained a search warrant for Defendant's phone, allowing them to track its location in fifteen-minute increments. By monitoring this data, law enforcement confirmed that Defendant took two trips to Florence, South Carolina between February 6 and February 8, 2023. During both trips, Defendant travelled south on I-95 and returned to the Fayetteville area after staying in Florence for less than fifteen minutes. On February 8, while Defendant was returning from his second trip, law enforcement executed a traffic stop on the Lincoln SUV and confirmed that Defendant was in the driver. During the traffic stop, a K-9 unit alerted to the presence of drugs, and law enforcement searched the car. They did not find any illicit substances, and no arrest was made.

The next day, law enforcement obtained a GPS tracker warrant for Defendant's car and began to conduct extensive virtual and physical surveillance. The tracker transmitted location data for Defendant's car to law enforcement in two-minute increments, and it revealed that between February 12 and March 28, Defendant made numerous trips. For the sake of brevity, the court provides a summary below:

- On February 10, 2023, Defendant travelled to Lillington, North Carolina and parked in front of a home in a residential neighborhood. Law enforcement observed numerous cars drive to the house, interact with individuals coming from inside the

2

home, and thereafter drive off. Law enforcement believed this to be consistent with "transactional type activity" or an "open air drug market."

- On February 12, 2023, Defendant travelled to Philadelphia, Pennsylvania. After arriving in the city, he stayed for approximately ten minutes before traveling to New York City, New York. While in New York, he stopped several times in residential neighborhoods before spending the night at a hotel near LaGuardia Airport. He returned to Fayetteville in the morning.

- On February 28, 2023, Defendant travelled to Huntersville, North Carolina, a suburb of Charlotte, North Carolina, and visited the home of Brian Sullivan. Notably, Mr. Sullivan was then on federal probation for drug trafficking.

- Between March 2 and March 13, 2023, Defendant made four more trips to Florence. During each trip, he made brief stops at a Comfort Inn before returning immediately to Fayetteville. These stops typically lasted between two and twelve minutes. On one trip, law enforcement observed Defendant pull into the hotel parking lot before exiting his vehicle and entering an adjacent vehicle. He rummaged around inside the car for several minutes before re-entering his own car and driving away. Law enforcement looked through the window of the parked vehicle but saw nothing immediately indicating criminal activity.

- On March 23, 2023, Defendant again travelled to Huntersville. After making brief stops at several local businesses, he returned to Fayetteville on the same day.

- On March 28, 2023, Defendant made a second trip to Philadelphia. He made two brief stops within eight minutes, then turned around and began travelling south towards Fayetteville.

3

Believing these travel patterns to be indicative of drug-trafficking activities, the Cumberland County Sheriff's Office coordinated with the North Carolina State Highway Patrol to effectuate a traffic stop on Defendant during his second return trip from Philadelphia. The Sheriff's Office, which had conducted the previously described investigation, requested that State Highway Patrol Trooper Donald N. Pope ("Trooper Pope") conduct the stop. Trooper Pope was informed that Defendant was the subject of a months-long drug-trafficking investigation. He knew that Defendant had travelled to Philadelphia and, after staying for several minutes, was driving south on I-95 in a white Lincoln SUV. The Sheriff's Office provided Trooper Pope with regular updates about Defendant's whereabouts.

In the early morning of March 28, Defendant exited I-95 onto Highway 64 towards Raleigh. He was pulled over at 7:02 a.m. after leaving a Biscuitville parking lot and swerving between lanes. Once Trooper Pope activated his blue lights, Defendant signaled that he was going to pull over and drove into the parking lot of a mechanic shop.

Trooper Pope got out of his car and approached the passenger side window of the Lincoln SUV. Defendant acknowledged that he swerved on the road and advised that this occurred after he reached for a breakfast sandwich. Trooper Pope reported noticing a faint odor of unburnt marijuana and the "overwhelming odor of air freshener," presumably caused by the seven air fresheners hanging from the gear shift. Trooper Pope also advised that during the interaction, Defendant was "shaking uncontrollably," and his hand was shaking "violently" as he handed Trooper Pope his identification. Defendant initially handed Trooper Pope his debit card. After being informed of his mistake, Defendant laughed and handed over his driver's license. Trooper Pope advised that if his license and registration were valid, Defendant would only be issued a warning, and he asked Defendant to follow him to his patrol vehicle. Defendant complied. Before

4

entering the patrol vehicle, Trooper Pope conducted a pat down search of Defendant's outer clothing, and he felt no sign of drugs or weapons. Once in the car, Trooper Pope began to conduct a record check and draft a written warning citation. In the interim, Defendant volunteered that he was coming from his home in Lillington to a car wash in Garner, North Carolina, over twenty-seven miles away. Trooper Pope remarked that the car looked clean, and Defendant responded that he wanted to wash the pollen off.

Trooper Pope's printer did not work, so he issued Defendant a verbal warning, returned his documents, and told him to "have a nice day." As Defendant began to leave the patrol car, Trooper Pope asked, "do you mind if I ask you a few questions?" Defendant sat back down and told Trooper Pope to "go ahead." Trooper Pope asked whether there were drugs, weapons, or U.S. currency in the car. Defendant said no. When Trooper Pope asked to search his vehicle, Defendant declined, stating, "I am not being rude; I just don't want you searching my car." At this point, at approximately 7:08 a.m., Trooper Pope signaled for another law enforcement officer to bring out a police dog, and he informed Defendant that he was going to run the dog around the vehicle. Defendant replied that he was fine with that. Trooper Pope testified that the dog alerted at the trunk of the vehicle within thirty seconds. A search of the trunk revealed a black box, inside of which was approximately 4.5 kilograms of methamphetamine and 4.8 kilograms of cocaine.

## II. Procedural History

On December 5, 2023, Defendant was charged in a three-count superseding indictment with conspiracy to distribute and with possession with the intent to distribute cocaine, methamphetamine, and fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 846; possession with the intent to distribute methamphetamine and cocaine, in violation of 21 U.S.C. § 841(a)(1); and

possession with the intent to distribute methamphetamine and fentanyl, in violation of 21 U.S.C. § 841(a). [DE 12].

On August 8, 2024, Defendant moved to suppress all evidence seized during the March 28, 2023, traffic stop. [DE 29]. The United States filed a response in opposition. [DE 33]. On January 13, 2025, the court held a hearing and heard oral argument from the parties.

## III. Legal Standards

The defendant bears the burden of proving that his Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Reid*, 99 F. App'x 482, 484 (4th Cir. 2004) (citing *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978)). "As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence." *United States v. Adkinson*, 191 F. Supp. 3d 565, 568 (E.D. Va. 2016) (citations omitted). "Once the defendant establishes a basis for his suppression motion, the burden shifts to the government." *Id.* On an order resolving a motion to suppress, the Fourth Circuit will review a district court's factual findings for clear error and legal conclusions de novo. *United States v. Hill*, 849 F.3d 195, 200 (4th Cir. 2017).

The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. This simple statement has since received much judicial gloss.

A traffic stop "constitutes a 'seizure' under the Fourth Amendment and is thus subject to a reasonableness requirement." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015). Because a traffic stop is "more akin to an investigative detention than a custodial arrest," courts review these stops under the two-prong standard established in *Terry v. Ohio*, 392 U.S. 1, 88 (1968). *Id.* "Under *Terry*, a traffic stop is reasonable if (1) the stop is legitimate at its inception

6

and (2) the officer's actions during the stop are reasonably related in scope to the basis for the stop." *United States v. Perez*, 30 F.4th 369, 375 (4th Cir. 2022).

Generally, an officer "must focus his attention on the initial basis for the stop." *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017). However, while diligently pursuing that purpose, an officer may engage in other investigative inquiries so long as they "do not measurably extend the duration" of the officer's investigation. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015). A stop may "last no longer than is necessary to effectuate [its] purpose," so the authority for the stop will end once the tasks necessary to address the infraction are or reasonably should be completed. *Id.* at 354. To that end, law enforcement may "engage a K-9 unit to conduct a 'dog sniff' around a vehicle during a traffic stop in an attempt to identify potential narcotics," but without further justification, this must occur during the time reasonably necessary to address the traffic violation. *Hill*, 852 F.3d at 382; *see also Rodriguez* 575 U.S. at 355. If law enforcement wants to detain an individual beyond this period, "he must possess a justification for doing so other than the initial traffic violation." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008). Specifically, law enforcement must either (1) obtain consent from the individuals detained; or (2) identify facts which establish reasonable and articulable suspicion of further criminal activity. *Perez*, 30 F.4th at 375.

To determine whether an individual has consented to an extension of a traffic stop, courts first determine whether than individual has been seized. *See United States v. Bowman*, 884 F.3d 200, 211 (4th Cir. 2018). "An individual is seized when an officer by means of physical force or show of authority, has in some way restrained his liberty." *Id.* (quoting *Terry*, 392 U.S. at 19, n.16). So, to differentiate between consensual encounters and seizures effectuated by a demonstration of authority, courts ask "whether, under the totality of the circumstances

7

surrounding the encounter, a reasonable person in the suspect's position 'would have felt free to decline the officers' requests or otherwise terminate the encounter." *United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) (quoting *Florida v. Bostick*, 501 U.S. 429, 438 (1991)).

Law enforcement may search a vehicle without a warrant "if [the] car is readily mobile and probable cause exists to believe it contains contraband." *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). A vehicle is readily mobile if "it is being used on the highways or is readily capable of such use." *Id.* at 591 (quoting *California v. Carney*, 471 U.S. 386, 392–93, 394 n.3 (1985)). The scope of this search "is as broad as a magistrate could authorize," so "once police have probable cause, they may search every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 589–90 (citations and quotations omitted).

### IV. Discussion

Defendant concedes that law enforcement had a valid basis for effectuating the traffic stop. [DE 29 at 4]. He argues instead that once Trooper Pope returned his documents and told him to "have a nice day," the tasks necessary to address the traffic violation were completed. *Id.* at 5. He contests that Trooper Pope had reasonable suspicion to extend the stop beyond this point, and he argues that Defendant's purported consent to do so was not voluntarily given. *Id.* The United States disagrees. It argues that any extension of the traffic stop was supported by reasonable suspicion, which existed at the initiation of the traffic stop and was further reinforced by Defendant's behavior during his interaction with law enforcement. [DE 33 at 8].

Before proceeding to Defendant's *Rodriguez* argument, the court finds that Trooper Pope had probable cause to search the vehicle once he smelled marijuana. "An officer's detection of marijuana creates . . . probable cause." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019).

8

Case 5:23-cr-00336-M-BM    Document 40    Filed 01/27/25    Page 8 of 11

Trooper Pope stated that upon his approach to the passenger side window of the vehicle, he detected the "faint odor of marijuana." [DE 33 at 4]. He specified at the motion hearing that this was the odor of "unburned marijuana," or in other words, "green leafy buds." Trooper Pope also noted that this was accompanied by "the overwhelming odor of air freshener" caused by seven air fresheners hanging throughout the interior of the car. Trooper Pope's capacity to smell and identify these odors are consistent with his training and experience, and the court affords his testimony due weight, finding that there was probable cause to believe unburned marijuana existed inside the vehicle. Because the search of the vehicle occurred while law enforcement had probable cause to believe that marijuana existed in the vehicle, the search was proper under the automobile exception.

The court also finds that from its inception, Trooper Pope had reasonable and articulable suspicion to justify an extension of the traffic stop. The stop was the culmination of a months-long drug trafficking investigation into Defendant. Under the constructive knowledge doctrine, the court "substitute[s] the knowledge of the instructing officer or officers for the knowledge of the acting officer." *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (emphasis omitted), and assumes, therefore, that Trooper Pope possessed knowledge of all facts known to the Sheriff's Office at the time he was asked to make a traffic stop. *See United States v. Jordan*, 952 F.3d 160, 166 (4th Cir. 2020) (imputing the knowledge of the detective to the detaining officer). Trooper Pope indeed stated that he was aware that Defendant was the subject of an extensive drug-trafficking investigation. He testified to having actual knowledge of Defendant's trip to and ten-minute stay in Philadelphia, behavior consistent with both the re-supply and delivery of narcotics. He also had constructive knowledge of the confidential informant's identification of Defendant as a source supply for methamphetamine; of the search warrants issued, based on

9

probable cause, for the tracking of Defendant's phone and car; of his communication and interaction with individuals known by law enforcement to be under investigation or indictment for drug trafficking; and of the specific circumstances of the above-described trips. Taken together, this knowledge was sufficient to create a "particularized and objective basis for suspecting [Defendant] of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). It was enough, then, to independently justify the brief extension of the traffic stop. *See Perez*, 30 F.4th at 375.

Defendant resists this conclusion. He argues that if reasonable suspicion existed when the traffic stop began, it would be inconsistent for law enforcement to wait until they completed their traffic investigation to utilize a K-9 unit. Trooper Pope's testimony provided some context. He testified that N.C. State Highway Patrol policy discourages the use of a K-9 unit before the initial basis for the traffic stop is resolved. In other words, troopers are instructed to complete the paperwork necessary to address a traffic infraction and then seek consent *before* they utilize a detection dog. This certainly addresses Defendant's argument, but such a policy exposes the agency to *Rodriguez* challenges.[1] In any event, Trooper Pope's decision to run the detection dog after addressing the traffic infraction does not negate the above-described basis for reasonable suspicion, and the thirty-second delay occasioned by its use was not so excessive as to raise constitutional concern.

---

[1] It is entirely consistent with the Fourth Amendment, and in the court's view, more efficient, to run a K-9 unit contemporaneously with the underlying traffic investigation. *See Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop . . . does not violate the Fourth Amendment."). The policy may serve other interests, such as officer safety, so the court casts no aspersion on a decision made with expertise it does not possess. The court raises the issue merely to point out that by waiting to utilize a K-9 unit until after the initial basis for the stop is resolved, law enforcement will increase the likelihood that evidence obtained in subsequent investigations will be subject to exclusion.

Even if reasonable suspicion had not firmly been established at the time of the stop, Defendant's behavior during the stop, considered in conjunction with Trooper Pope's knowledge of the drug-trafficking investigation, certainly did so. Most notably, Defendant lied to Trooper Pope. He stated that he was driving from Lillington to a car wash in Garner, over twenty-seven miles away. [DE 33 at 5]. Trooper Pope knew this to be false. He knew that Defendant was returning south from a trip to Philadelphia, not driving north from Lillington to Garner. Coupled with Defendant's extreme nervousness during the interaction, these facts, when considered in tandem with the information gleaned from the drug trafficking investigation, would also establish reasonable suspicion of criminal activity.[2]

Because law enforcement had, at a minimum, reasonable and articulable suspicion of further criminal activity, the use of the detector dog to prolong the stop was proper. *See Perez*, 30 F.4th at 375. And as, "a court may presume . . . that the dog's alert provides probable cause to search," *Florida v. Harris*, 568 U.S. 237, 247 (2013), law enforcement obtained the legal right to search Defendant's trunk when the K-9 signaled to the presence of drugs. *See Kelly*, 592 F.3d at 589.

## V. Conclusion

For the aforementioned reasons, Defendant's Motion to Suppress [DE 29] is DENIED.

SO ORDERED this __27th__ day of January, 2025.

_Richard E. Myers II_
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

---

[2] Principles of consent are also implicated in this case, but considering the two prior bases for denying Defendant's motion, the court declines to address them.

11